**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

DEC 1 4 2011

BY DAVID J. MALAND, CLERK
DEPUTY _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| R. DAVID WEISSKOPF, pro se | ) | **COMPLAINT** |
| | ) | **JURY TRIAL** |
| Plaintiff | ) | **DEMANDED** |
| | ) | |
| VS. | ) | 6:11cv668 |
| | ) | |
| UNITED JEWISH APPEAL - FEDERATION OF | ) | |
| JEWISH PHILANTHROPIES OF NEW YORK, INC., | ) | |
| EL PASO E&P COMPANY L.P., KINDER | ) | |
| MORGAN, INC. | ) | |
| | ) | |
| Defendants | ) | |

CLERK, U.S. DISTRICT COURT
RECEIVED
DEC 1 4 2011
EASTERN DIST. OF TEXAS

COMES NOW, Plaintiff R. David Weisskopf, pro se, for his Complaint against the Defendants, and states as follows:

A.   **INTRODUCTION**

This is an action filed under the Alien Tort Claims Act, 28 U.S.C.§`350 et seq. (ATCA). Plaintiff seeks relief and damages for gross violations of human rights arising out of an institutionalized discriminatory policy of disengaging and separating fathers from their minor children in Israel, which is aided and abetted, facilitated, enabled by the acts and donations of Defendants.

Plaintiff asserts that Defendants' actions constitute crimes against humanity, violations of civil and human rights, torture of Plaintiff, his children and all other individuals who are similarly situated.  Defendants and their agents, have acted in concert with the members of the Israeli Judiciary and employees of the Israeli Ministry of Welfare in aiding, abetting, facilitating, directing, orchestrating these practices.  Defendants' actions constitute an actionable claim under ATCA, a violation of the Law of Nations, international law, the laws of the United States of America and of individual states, including but not limited to Texas, and the natural laws of man.

Defendants collect monies in the United States that are transferred to radical feminist entities, organizations and other institutions that advocate the destruction of families, divorces, the disengagement of fathers from children, forcing men into destitution, and even knowingly putting divorced fathers in Plaintiff into life-threatening situations.

**B.**   **PARTIES**

1. Plaintiff resides at 2364 Jackson St. #202 at Stoughton, WI  53585. (Tel. 1-608-492-1477.)  Plaintiff is the biological father of Minors; L (age 7), N (age 5), and M (age 3) with legal parental rights.  He and his children are being wrongfully detained in Israel.

2. Defendant, United Jewish Appeal – Federation of Jewish Philanthropies of New York (UJAFJPNY), whose principal officer is JOHN S. RUSKAY, is located at: 130 East 59th St., NY, NY 10022-1302 (Tel. 1-212-836-1327).   Defendant, UJAFJPNY, is a not-for-profit corporation in the U.S.A. and  is subject to Internal Revenue Service (IRS) regulations under sections 501(c)(3), 509(a)(1) and 170(1)(A) of the Internal Revenue Code.   As the most powerful member of the Jewish Federations of North America, UJAFJPNY is one of the most influential non-government entities affecting nearly every policy in the Israeli parliament and government – including the crusade against fathers in divorce.  UJAFJPNY is specifically responsible for funding "Shiluv Institute for Family & Couple Therapy", a private facility that employs Ruth Eisenmann, a social worker who abuses her powers by dominating and destroying fathers like Plaintiff in divorce with a reputation as an abusive official who poses a threat to the public.

3. Defendant, El Paso E & P Company L.P., is located at: 1001 Louisiana St., Houston, TX  77002 (Tel. 1-713-420-2600).   Defendant, El Paso E&P, is responsible for providing and servicing nearly $7 million in oil investments for Defendant UJAFJPNY; which helped Defendant UJAFJPNY to send money to organizations in Israel devoted to the break-up of Israeli families, and to the annihilation of men in divorce, and disengagement of fathers from children.

4. Defendant, Kinder Morgan, inc., is located at: 1101 Loop; 323-E., Tyler, TX  75708 (Tel. 1-903-534-6100).  Defendant, Kinder Morgan, is responsible for providing and servicing oil assets and investments for Defendants UJAFJPNY & El Paso E&P in Tyler, TX. Their efforts helped enable Defendant UJAFJPNY to send money to organizations in Israel devoted to the break-up of Israeli families, and to the annihilation of men in divorce, and disengagement of fathers from children.

5.  Plaintiff brings this complaint on his own behalf, and those similarly situated, as a victim of systematic persecution, torture and denial of human and civil rights of men in divorce proceedings, who are also subject to, abuse, harm and threats by or as a direct and proximate result of Defendants' actions as described herein.

**C.   JURISDICTION AND VENUE**

6.  The Court has subject matter jurisdiction over this case because two of the three Defendants reside in the State of Texas, while the Plaintiff and one Defendant reside in two different localities.

7.  The Court has subject matter jurisdiction over this case because all three Defendants maintain offices and assets in Tyler, Texas.

8.  The Court has subject matter jurisdiction over this case under the Alien Tort Claims Act (ATCA) 28 U.S.C. § 1350 and pursuant to the Torture Victim Protection Act of 1991 (TVPA) 28 U.S.C. § 1350 Pub. L. 102–256, note § 2(a).

9.  The court also has jurisdiction pursuant to 28 U.S.C. § 1331 encompassing actions which present a "federal question".

10. The Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because the impact of Defendants' actions impact Plaintiff in this district.

11. Defendants are subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq., because their conduct falls within the exceptions to foreign sovereign immunity set forth in 28 U.S.C. §§ 1605(a)(5) and 1605(a)(7).

12. The amount in controversy, both individually and collectively, exceeds one million U.S. Dollars.

**D.   FACTUAL BACKGROUND**

13. Plaintiff's claims arise in conjunction with his efforts to obtain visitation rights and custody of his minor children who have been wrongfully removed from the United States and wrongfully detained in Israel.

14. Plaintiff's minor children were taken by their mother to Israel.

15. Once in Israel, the children's mother refused to return to the United States.

16. Israel's entire judicial system lacks due process for fathers in such situations.  In her August 25, 2011 ruling in the Superior Court of New Jersey, the Honorable Bonnie J.

Mizdol noted, "the Israeli Supreme Court rendered opinions very different than those done here in New Jersey or the United States," (Ben-Haim v. Ben Haim #FD 02-906-11). She further noted concerning the father's experience in the Israeli judicial system, "This Court finds that the entire situation was laden with duress."

17. Since its inception, Defendant UJAFJPNY has been one of the most influential non-governmental entities holding sway over policies in the Israeli parliament and government in general and the anti-father crusade specifically.

18. Defendant UJAFJPNY maintains an Israeli office to actively ensure the Israeli government carries out their policies according to page 28 of their IRS form 990 in 2009.

19. For example, Defendant UJAFJPNY transferred $407,000 to Bar-Ilan University under the euphemistic term "Jewish Identity" according to page 32 of their 2009 990 filing. Bar Ilan employs Dr. Ruth Halperin Kaddari, who drafts proposed amendments designed to suppress men under the auspices of empowering women in legal issues.

20. Bar Ilan University applied a portion of those designated funds for Ruth Halperin-Kaddari's "Advancement of Women's Status" department to submit a report to the Knesset Committee for Women & Children dated 8 November 2011. This report argued in defiance against recommendations from child welfare experts and in defiance against every international law and treaty, that children under the age of 6 are always better off in the exclusive custody of their mothers and never with their fathers.

21. Defendant UJAFJPNY's Form 990 which they filed with the IRS for the 2009 tax year includes several women's rights organizations and several "family" organizations which advocate against men in divorce. Their 94-page filing does not include a single father's rights advocacy nor a single organization that assists single and/or handicapped fathers in distress after their divorces.

22. Defendant UJAFJPNY specifically transferred funds to Shiluv under the euphemistic term "integration" according to page 60 of their IRS form 990 in 2009. It is Shiluv's practice to "hire" governmental officials onto their payroll as a pay-off for preferential treatment like free office space in prime real estate locations. Shiluv employs Ruth Eisenmann as a social worker in conflict-of-interest with her employment as a governmental child protection worker. Such social workers make bias and discriminatory determinations based on, "intuition" and libel, without adherence to

laws, regulations or codes of ethics or codes of evidence in a way that portrays them as "above the law" and are immune from investigation or prosecution.  Ruth Eisenmann specifically is well-known to abuse her powers in ways that harm children and therefore poses a threat to the public [Exhibit A].

23. Defendant UJAFJPNY encourages Jewish families to emigrate to Israel according to page 2 of their IRS form 990 in 2009 only to turn against the fathers after they settle in Israel, as those American immigrants are exposed to propaganda in Israel designed to break up marriage, encourage single motherhood, file false DV complaints, and disengagement of children from fathers, as part of the agenda of "women empowerment".

24. Since Defendant UJAFJPNY maintains an office in Israel to closely monitor their lobbying efforts and since Defendant UJAFJPNY has so much influence over Israeli policies; they are responsible for every rule and policy which the Ministry of Justice, Ministry of Welfare and the Israeli government in general implement which violate international civil and human rights against fathers in divorce proceedings.

25. Since one should reasonably expect Defendants El Paso E&P and Kinder Morgan to demand accountability for such large sums being entrusted and spent in Israel, all Defendants are equally responsible for every rule and policy which the Ministry of Justice, Ministry of Welfare, and the Israeli government in general implements which violate international civil and human rights against fathers in divorce proceedings.

26. In Israel, women are improperly favored in divorce proceedings.  Women receive preferential treatment in Israel and Plaintiff is entitled to the same level of treatment.

27. Examples of preferential treatment for women in divorce proceedings include automatic interim child custody, presumptive permanent custody, and exemption from producing financial records.

28. Most egregiously, women are encouraged to allege false domestic violence complaints in support of their divorce and child custody actions.  These false domestic violence actions are granted presumptive validity by the courts and men are precluded from substantively contesting the allegations because of due process violations.

29. Plaintiff is entitled to protections under the Treaty of Friendship, Commerce and Navigation and between Israel and the United States, signed in 1951 (the "Friendship Treaty").

30. Pursuant to the Friendship Treaty, Article 5, the Plaintiff is entitled to a "most favored nations treatment with respect to access to the Courts of Justice...both in pursuit and

in defense of their rights", and pursuant to article VI (1) "property of nationals and companies of either party shall receive the most constant protection and security".

31. In essence, Plaintiff is entitled to treatment in Israel that is no less favorable than the sector that receives the most preferential treatment in Israel.

32. Contrary to the requirements of the Friendship Treaty, Defendants are responsible for the denial of the benefits and protections of the Treaty. As a result, Plaintiff is being treated in Israel in a manner which constitutes and is equivalent to torture and violations of his most fundamental international human rights.

33. As a result of Defendants' funding and lobbying, the Israeli government engages in a systematic practice of torture, violations of human rights and egregious gender discrimination for the intentional purpose of separating fathers from their biological children in formal proceedings regarding the dissolution of family relations.

34. In order to perpetrate the assault and torture of men filing for divorce, Defendants' agents utilizes a myriad of tools to suppress men and torture them, as follows:

(a)   Promoting the automatic transfer of children in divorce to mothers,

(b)   This causes automatic disengagement of fathers from children either completely or by forcing men into supervised visitation centers where girls as young as 18 have authority over fathers to dominate and humiliate them in front of their children (and even post their donor plaques in such centers),

(c)   Defendants sponsor efforts that encourage women to file false domestic violence complaints against men and remove them from their homes,

(d)   Defendants' efforts result in validating false domestic violence complaints,

(e)   Defendants' efforts result in placing greater evidentiary weight on the woman's allegations in Family Courts and Criminal Courts,

(f)   Defendants' efforts result in automatic grants motions against men without due process, oftentimes ex parte,

(g)   Defendants' efforts result in unconscionable child supports awards against men (sometimes at 80% to 250% of the men's actual salary) regardless of women's income for the improper intent of prejudicing them, making them unable to meet court-imposed obligations and coercing them into giving up their parental rights,

(h)   Defendants' efforts result in attributing to men fictitious "imputed salaries" without testimony or evidentiary support,

(i)   Defendants' efforts result in depleting men's property and transfer it to their wives without testimony, evidentiary support or due process,

(j)   Defendants' efforts cause men to be arrested without due process for inability to pay child support, result in the revocation of men's passports, driver's licenses and deny men the ability to work by issuing a constant stream of executions and levies.

35. Divorced fathers in other matrimonial proceedings are automatically treated as "second class citizens".  Defendants intentionally cause discrimination against such men who lose the protections of their human rights.

36. Indeed, the "status" of a "man in divorce proceedings" in Israel is in essence institutionalized torture and denial of civil rights.  The state refuses to recognize any rights to fatherhood, family life and contact with children, and it routinely divests and destroys men's rights in this area.

37. The Defendants lobby for the Israeli government to officially interpret the right to family life as dependent on the concept of "mother's consent", a concept which the international community and European Court of Human Rights and other international tribunals discarded long ago.

38. The "mother's consent" doctrine is facially invalid and discriminatory because its very nature is to favor one party's position over another without any objective evidentiary scrutiny, assessment of accuracy or actual of proof.  It is completely subjective and without basis in fact.

39. Defendants' efforts result in policies that institutionalize the practice of egregious and unconscionable discrimination and the acceptance of unequal statutory presumptions as follows:

(a)   The "Tender Years Presumption" gives automatic custody of children to mothers;

(b)   Men are oftentimes referred to social workers who act as personal criminal probation officers and cancel visitations at will.

(c)   The rate of supervised visitations in Israel is the highest anywhere in the world (over 25%), compared with 1-3% in the U.S.

(d)   The rate of false arrests and false convictions is also extremely high, and the false arrests are one more institutionalized tool to disengage fathers from children.

(e)   Child support awards do not take into account the women's income when calculating amount of child support.  Child support awards should be formulas based on disposable income as is the case on any other democracy.  Instead, Israeli child support awards are based on multiplying the number of children by a set base amount (about $350 per child), and then adding additional amounts (e.g., 30%, 40% and 50%

of the woman's monthly rent, medical, dental, extracurricular, babysitting, and anything else the Judge may impose at his/her discretion).   As a result, most men are slapped with child support burdens that exceed their income.   Therefore, the rate of non-disposable income vs. burden of child support is unconscionable and is the highest rate in the world.

40. Defendants are also responsible for impositions and enforcements of discriminatory domestic violence guidelines.   Women enjoy immunity from prosecution for making false complaints.   This practice encourages free and careless false reports, which result in automatic police orders removing husbands from their homes.

41. In Israeli Family Courts, the Court does not engage in an objective determination of justice. Instead, it systematically grants the woman's petition for interim custody immediately, and refers the men to social workers, who become the real judge of the case.   The social workers are trained to coach women to refuse visitations to the men.

42. Defendants are responsible for the built-in mechanisms to deter men from making applications for child support reductions or visitation expansion because those applications are routinely denied without hearing and often result in exorbitant monetary sanctions that further impoverish the men.

43. Despite the lack of due process or full and complete evidentiary hearings, judges can issue judgments without trials, on a whim, and out of the blue.

44. Defendants' campaign also results in denying men due process by refusing applications to summon witnesses or financial records, denying applications to cross examine social workers' exaggerated and falsified reports, or issuing a "Judgment" at will, without trials at all.   Family Court proceedings lack fair justice and equal protection.

45. In addition, appeals from Family Court are intentionally expensive and out of reach for the average man when a $3,000 bond is necessary to secure the appeal.

46. The policies result in ongoing damage to the father-child relationship through the imposition of supervised visitation requirements.   The per-capita rate of supervised visitation at "Contact Centers" in Israel is the highest in the world at 2,428 families in 2010, out of 9,000 divorces (including divorces-without-children).   Periods of state-enforced disengagement and alienation can last 2 years, 5 years and in an extreme case, 12 years.

47. Defendants' efforts result in policies which also impose a strict and unconscionable regime of supervised father-child relationships.

48. There is no real judicial evidentiary determination of father-child contact decisions, orders or judgments. Rather, Family Court judges simply delegate the authority to determine father's levels of contact with children to state-employed social workers who serve as court aides.

49. In making their determinations, social workers utilize a presumption that the mother is the parent best suited for custody under Capacity and Guardianship Law, Section 2.5. As a result, women are routinely granted primary physical custody rights on application alone. Conversely, men are referred to social workers for "investigation", character assessment and reports. This practice is discriminatory on its face.

50. The social workers routinely threaten the fathers, and collect rumors and false statements against them; entice women to file false domestic violence complaints to expel men from their own homes, or delay proceedings pending referrals to private and costly "Dangerous Propensity Tests" or "Parental Fitness Tests". These tests of the ability to "serve as a father" feed a booming industry of mental evaluators at up to $5,000 per test.

51. Moreover, it is simply degrading and dehumanizing for a father who, devotedly raised his children during the marriage, and was certainly a fit and responsible parent be demonized upon his arrival into Israel. Those policies subject men to an unfair and discriminatory system which doubts his ability to parent.

52. As a general rule, court-appointed social workers routinely send the men to see their children in supervised visitations centers, and this is admitted in the press by the official in charge, Simona Shteinmetz. In these situations, fathers are treated like criminals, branded as "dangerous", and the children only get an hour or two per week with their fathers, for several years.

53. The supervised visitation system is also designed and operated to prejudice the father's rights. The supervised visitations take place at social worker's convenience, and the children only get one or two hours per week, during working hours. Thus, when the state, via its court-appointed social workers conditions visitations with children on supervised visitations (simply because of the mother's refusal to consent), fathers accumulate absences from work and risk losing their jobs and livelihoods, in order to see their children.

54. While women enjoy the benefits of preferential treatment on account of gender and receive custody without a fair trial, or any trial whatsoever, men are compelled to submit to the authority of biased and unqualified social workers, who write Social

Worker Reports whether she authorizes the father "grace" to see his children.  Fathers normally wait for such Social Worker Reports 3 months up to 9 months and sometimes longer.  After that, Courts routinely ask for several more "supplementary reports" where necessary, each taking several months to "prepare".

55. The process used to prepare Social Worker Reports is faulty and inherently discriminatory.  The social worker simply collects any piece of libel and defamation she can get from the woman, and encourages the woman to manufacture more lies.  It appears that character assassination of men is the usual practice of social workers.

56. The social worker is cloaked with absolute immunity, just like a judge.  In fact, once she is appointed, the social worker becomes the real judge of the case.  This practice violates the guarantees under article 10 of the International Covenant on Economic, Social and Cultural Rights (ICESCR), and its equivalent in other international Conventions, since the right to family life becomes conditioned on satisfying the whims of a hostile and biased social worker in every case and as to each child.

57. The State of Israel is signatory to international covenants such as the International Covenant on Civil and Political Rights (ICCPR), ICESCR and the Convention on the Rights of the Child (CRC).  Despite those agreements, Israel's various court systems systematically refuse to interpret the "right to family life" as including the automatic right of fathers to access the children without state interference. Instead, the state and its courts require the father to demonstrate why the child's best interest warrants that there is some access to the child by the father.  To that end, the Court compels fathers to submit to the authority of social workers for writing reports, and then supervising visitations, while women get automatic interim custody without a fair, evidentiary and adversarial hearing.

58. As a result of these policies, many men find themselves in supervised visitation settings having to see their children in prison-like settings one or two hours per week, simply because it is the Ministry of Welfare's unwritten policy to automatically refer men to supervised visitations whenever a woman voices disagreement with regular visitations.

59. Regarding domestic violence complaints, Defendants promote convictions merely on the unsupported and unfounded allegations of the alleged victim, no evidence is required other than the rehearsed words of the woman.  This is the pattern and practice in Israel even if prior to the divorce, there were never any domestic violence complaints, or complaints that the man posed a danger to the well-being of the child

or woman.  Despite this questionable lack of validity, domestic violence complaints result in the immediate removal of the husband from his home.  He is cut off from his clothing, records, personal belongings, and his children.

60. Defendants' campaign result in thousands of children being disengaged from their fathers every year, thousands of fathers being needlessly arrested, and thousands of fathers being forced to live lives of fear, taunted with endless and persistent persecution, and resulting in a suicide rate among divorced men that is 8 times higher than other men (which already outnumbers the rate among women by 3-to-1).

61. The institutionalized and statutory discrimination against fathers in Israel is a violation of international treaties, and a complaint on behalf of the fathers' rights organizations in Israel is pending before the United Nations Committee on Economic, Social and Cultural Rights, and hearings commenced on November 15-16, 2011 in Geneva.  The father's rights complaint to the United Nations along with exhaustive research and data about the attitude of Israeli Family Court Judges against all men are published and publicly available on the website of the Coalition for the Children and Family at www.ccfisrael.org.

## E.  FACTS SPECIFIC TO PLAINTIFF

62. Plaintiff is the biological father of Minors L, N, M with legal parental rights.

63. Plaintiff formerly consulted with the director of the Illinois Department of Children & Family Services (IDCFS) to reform their child welfare continuum, worked as a child welfare professional at Maryville Academy, served as an advisor to the chairman of the Knesset Social Welfare Lobby, founded a charity to advocate for Israeli orphans and at-risk kids and was licensed as a foster parent.

64. After moving to Israel, Plaintiff was subjected to discriminatory treatment solely based on his gender.

65. Plaintiff's visitation rights with his children were also limited to supervised visits without any legitimate or credible evidence that supervision was necessary.

66. Plaintiff and his children were falsely imprisoned for 1 to 3 hours per week in prison-like conditions as their only contact allowed by Defendants' agent, Ruth Eisenmann, for over 1 year.  Plaintiff and his children were under lock-and-key monitored by an armed guard wearing a "prison guard" style uniform.

67. In fact, Plaintiff was targeted and treated worse than a convicted criminal.  While prisoners have a right to daily telephone contact with their children, Defendants'

agent, Ruth Eisenmann, grudgingly allowed Plaintiff only 3 telephone conversations with his children in over 2 years.

68. Defendants funded Ruth Eisenmann via Shiluv who then conspired with Edna Brownshtein and conspired with and paid a bribe to Dr. Gutkovsky, to file false and exaggerated reports against Plaintiff in court including a "diagnosis" of "Active Psychosis" which proved to be bogus.

69. Defendants' agents used the U.S. mail to steal Plaintiff's sealed childhood IDCFS records from the USA, including his private medical records, and attempted to suppress his adult credentials as a child welfare professional and licensed foster parent. Defendants' agent, Ruth Eisenmann, knowingly and with malicious intent distorted Plaintiff's profile to perpetuate their ongoing constructive abduction and wrongful retention and wrongful imprisonment of the Minors and their ongoing physical and emotional torture; and wrongful imprisonment of the Plaintiff.

70. Defendants' agent, Ruth Eisenmann, physically tortured Plaintiff by exploiting his medical distress which included a broken leg and cyst in his sinus which fractured the surrounding bone in his face. Defendants' agents took steps to obstruct his ability to seek proper medical attention by confiscating all his assets, monies and medical records and blocked him from seeking medical attention in the USA. They specifically demanded that he perform physical tasks beyond his handicapped abilities and which violated physician's orders in front of his children. When he failed to meet their demands, they claimed his physical limitations were manifestations of being "psychologically passive".

71. The environment in which Plaintiff endured physical torture was independently witnessed by 3 American citizens in separate incidents who currently reside in the United States. Two currently work as registered nurses and one currently works in law enforcement.

72. Defendants' agent, Ruth Eisenmann, bullied the judge into making harmful rulings. On example involved schooling to forcibly convert Minor L to Orthodox Judaism against Plaintiff's wishes. The judge ruled against Plaintiff who wanted Minor L enrolled in the public school two blocks away from her residence. The judge emphasized in his ruling that he always orders that children enroll in the closest school to their home and never contradicts himself. He then ordered Minor L to endure a 45 minute bus ride to an ultra-Orthodox school in a completely foreign

environment 5 miles past the public school located in Minor L's neighborhood.  Such illogical rulings are due to reports from Defendants' agent, Ruth Eisenmann.

73. At age 7, Minor L now requires psychiatric and psychological therapy resulting from emotional torture she has suffered at the hands of the Defendants' agents.  Minors N and M also display signs of emotional harm they have suffered at the hands of Defendants' agents.  Despite this, Defendants' agent, Ruth Eisenmann, continues perpetrating constructive abduction wrongful retention and wrongful imprisonment of the Minors; and torture of Plaintiff in violation of the Hague Convention for the Civil Aspects of International Child Abduction (25 Oct 1980) and the Friendship Treaty between the USA and Israel.

74. Defendants violate Plaintiff's and the Minors' civil and human rights as a "Protected Class" religious minority in Israel, the USA, by international laws and treaties, the State of Texas, and the natural laws of man.  They fund the forcible conversion of the Minors to Orthodox Judaism and forcibly gag Plaintiff from continuing the religious practices which Plaintiff and his children have shared since birth.  Though Plaintiff and the Minors are religious minorities and therefore entitled to Protected Class status both in Israel and the USA, both countries officially recognize their religion as being normative.

75. Defendants financed the total destruction of Plaintiff's ability to work in child welfare or retrain in his usual career after the onslaught of torturous abuses – including marking his permanent file with a bogus "Active Psychosis" label.

76. Defendants recklessly demonstrated contempt for the Treaty of Friendship, Commerce and Navigation and between Israel and the United States, signed in 1951. Under Article 5 of this Treaty, the Plaintiff is entitled to a "most favored nations treatment with respect to access to the Courts of Justice…both in pursuit and in defense of their rights", and pursuant to article VI (1) "property of nationals and companies of either party shall receive the most constant protection and security".


## COUNT ONE
### AIDING AND ABETTING, INTENTIONALLY FACILITATING, AND/OR RECKLESSLY DISREGARDING CRIMES AGAINST HUMANITY IN VIOLATION OF INTERNATIONAL LAW

77. Plaintiff repeats and realleges all previous allegations with the same force and effect, as if fully set forth herein.

78. The rights to non-discrimination, equal protection, due process and family life (in the sense of right to parental access to children) are universally agreed upon as the law of nations and international law.

79. For example, the rights are enshrined in ICESCR Article 10(1) – The right to family life: "The widest possible protection and assistance should be accorded to the family, which is the natural and fundamental group unit of society, particularly for its establishment and while it is responsible for the care and education of dependent children."

80. When the Defendants violate all such universal rights, combined, and at the same time, it is an act of torture and terror applied against innocent citizens.

81. Defendants intentionally, knowingly and willingly facilitated, encouraged and/or condoned, or at minimum failed to take steps to protect the Plaintiff from

(a) The "Tender Years Presumption" which discriminates against men in favor of women and results in separation and alienation of fathers from children. While fathers await the social workers' report, mothers get instant custody, and indirectly receive the power to block the fathers' access to see their own children.

(b) Israeli Attorney General Guideline 2.5 which immunizes women from prosecution or liability due to false police reports of alleged violence.

(c) Israeli Police patrol Guidelines which mandate the issuance of orders of removal from home based on mere allegations of violence without evidence.

(d) Israel's policy of disengaging children from fathers.

(e) Israel's policies of allowing fathers access to children only in supervised visitations contact centers.

(f) Israel's policies of compelling fathers to prove their fitness to see children, and beg for the mercy of being granted visitations.   Fathers are entitled to the same presumption as mothers that they are good and loving parent.

(g) Israel's policies of postponing property distribution, and awarding most, if not all of the marital property as well as the husband's private property to the women.

(h) Israel's policies of issuing ex parte decisions in Family Court and in post Judgment Enforcement Offices.

(i) Israel's Family Court policies of inflicting excessive legal fees on husbands in almost every case.

82. By reason of the wrongful conduct of the Defendants, each and every one of them, jointly and severally, as hereinabove alleged, and the consequent crimes and torts

committed thereby, as hereinabove alleged, Plaintiff and others similarly situated men, suffered emotional and psychological harm due to stress and detachment from family, pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish and other mental and physical injuries.

83. The actions or omissions committed by Defendants constitute crimes against humanity in violation of the law of nations.

84. Crimes against humanity are likewise defined with a specificity sufficiently comparable to international law violations that were familiar when the ATS, 28 U.S.C. § 1350, was enacted.

85. The core elements of a crime against humanity in violation of international law, as codified in the above sources and recognized in international law generally, include various forms of heinous acts against human life, physical welfare, and dignity that are undertaken as part of a widespread or systematic attack against male population in Israel.

86. Crimes against humanity are punishable whether committed in time of peace or war.

87. Aiding and abetting and/or reckless disregard of crimes against humanity are actionable claims under the law of nations and this court has jurisdiction pursuant to the ATCA and ATS.

88. The Defendants' conduct was the sole proximate cause of the severe and continuing emotional distress that has been suffered by the Plaintiff and other similarly situated individuals, who have experienced similar human rights violations, torture, mayhem, false arrests etc. As a direct and proximate result of the intentional, reckless, outrageous and intolerable conduct of the Defendants, each and every one of them, jointly and severally, Plaintiff as well as other similarly situated men has suffered substantial damages including, but not limited to, $800,000.

89. Plaintiff is therefore entitled to judgment in his favor against Defendants and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of severe emotional distress, mental anguish, intense fear and anxiety, and manifestations of physical and emotional distress, such as loss of sleep, loss of appetite, back pains, migraine headaches, heart ailments, depression loss of self esteem, nervousness and anxiety. loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Court deems appropriate to compensate the Plaintiff, and

prevent Defendants from ever again supporting crimes against humanity in violation of the law of nations.

90. Defendants' actions towards Plaintiff and other similarly situated individuals was undertaken with the specific intent to harm and discriminate.

**WHEREFORE**, Plaintiff requests judgment in his favor and against Defendants in an amount in excess of $75,000 plus interest, costs, punitive damages attorney's fees and such other relief as the Court may determine.

## COUNT TWO
## RECKLESS DISREGARD
## FOR HUMAN AND PARENTAL RIGHTS

91. Plaintiff repeats and realleges all previous allegations with the same force and effect, as if fully set forth herein.

92. Defendants recklessly disregarded the Plaintiff's right to "most favored nations" treatment in Israeli Courts and other tribunals as no less favorable that the treatment enjoyed by women in divorce.

93. Defendants knew, or should have known, that their encouragement or disregard and/or negligence regarding the atrocities men in divorce suffer in Israel, will result in the harm, pain and suffering, as described above.

94. Defendants knew, or should have known, that they are disregarding the violation of rights of the American Plaintiff insofar as he is entitled to treatment in Israel at a "most favored nations" basis equal to the treatment women in Israel are entitled to.

95. Defendants knew, or should have known, that their disregard of the rights of Plaintiff, and others similarly situated causes an increased annual suicide rate among divorced men that is 8 times higher than other men which is a 3-to-1 ratio over women.

96. Defendants knew, or should have known, that their disregard of the rights of Plaintiff, and others similarly situated causes 4,122 children needlessly sent to contact centers under the almost automatic supervised visitations policies promulgated by Defendant UJAFJPNY's local Israeli representatives.

97. Defendants knew, or should have known, that their disregard of the rights of Plaintiff, and others similarly situated causes at least the same amount of disengagements of children from fathers every year.

98. Defendants knew, or should have known, that their disregard of the rights of Plaintiff, and others similarly situated, causes the impoverishment and false arrests of thousands of men each year.

99. Defendants knew, or should have known, that their disregard of the rights of Plaintiff, and others similarly situated causes the massive transfer of millions of dollars in properties lawfully belonging to men, which are taken without Due Process and given to women.

100.    Despite this knowledge, or despite the fact that they did not take reasonable steps to know what a reasonable person should know, Defendant UJAFJPNY intentionally turned a blind eye and failed to investigate or evaluate Plaintiff's assertions of improper conduct, Plaintiff's specific suffering and the impacts on others similarly situated.

101.    As a direct and proximate cause of the acts and omissions of Defendants foreseeable physical and emotional injuries were inflicted upon the Plaintiffs.

102.    As a result of the foregoing Plaintiff has been damaged in an amount not less than $8,000,000.

**WHEREFORE**, Plaintiff requests judgment in his favor and against Defendants in an amount in excess of $75,000 plus interest, costs, punitive damages, attorney's fees and such other relief as the Court may determine.

**COUNT THREE**
**FINANCING, AIDING AND ABETTING ACTS**
**OF PERSECUTION, UNIVERSALLY CONDEMNED**
**AS VIOLATIONS OF THE LAW OF NATIONS**

103. Plaintiff repeats and realleges all previous allegations with the same force and effect, as if fully set forth herein.

104. Defendants finance groups like Shiluv Institute for Family & Couple Therapy in Israel which employs Ruth Eisenmann to support, promote, and implement aggravation of the treatment of men such as the Plaintiff.

105. The prohibition against financing activities which are in contravention of international human rights rest on a clear and definite norm of customary international law that is universally accepted by the civilized world.

106. Consistent with its condemnation of gender-hate financing, the world community has also joined in defining who can be held liable.

107. Liability for financing torture reaches those that directly or indirectly provide or collect funds with the knowledge and purpose that the funds will be used to carry out a defined torture, regardless of whether the funds were actually used. Specifically, the United Nations Conventions reach every accomplice and every person who organizes or directs others in the torture financing effort.

108. Furthermore, legal entities may be held civilly liable for the offenses. This comports with the general international consensus embodied in the various United Nations Conventions.

109. Defendants knowingly, intentionally, and purposefully, directly and indirectly, aided and abetted, intentionally facilitated, and/or recklessly disregarded crimes against humanity in violation of the law of nations.

110. Defendants aided and abetted crimes against humanity by knowingly giving money to Shiluv who employs Ruth Eisenmann to devastate the ability of men to survive divorce in Israel.

111. Defendants knowingly provided over one billion dollars to organizations including Shiluv through private and charitable contributions with the purpose of supporting, widespread intentionally discriminatory practices, gender discrimination, direct and indirect child abuse, economic discrimination, institutionalizing gender discrimination and other heinous acts against human, civil and parental rights.

112. At all times, Defendants knew that the receipt, transfer, and disbursement of charitable funds were being paid to Ruth Eisenmann and others who perpetrate ferocious libelous attacks against Plaintiff and other male civilians in Israel.

113. Defendants aided and abetted, intentionally facilitated and/or recklessly disregarded the planning, preparation or execution of these crimes against humanity by providing organized and systematic financial support and other practical assistance, encouragement or moral support which had a substantial effect on the perpetration of crimes against humanity, with the knowledge and purpose that such actions would enable Ruth Eisenmann and others in the commission of crimes against humanity.

114. Defendants aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of customary international law, to wit, terrorist financing, by directly or indirectly knowingly providing funds to Shiluv who employs Ruth Eisenmann to carry out offenses as defined by the Financing Convention and customary international law.

115. Defendants' actions directly and materially contributed to the institutionalized discrimination which Plaintiffs and other similarly situated individuals suffered in divorce and child custody proceedings in Israel.

**WHEREFORE**, Plaintiff requests judgment in his favor and against each Defendant in an amount in excess of $20,000,000 plus interest, costs, punitive damages, attorney's fees and such other relief as the Court may determine and further request an order preventing Defendant UJAFJPNY, inc. from ever again engaging in the financing of terrorism in violation of the law of nations.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of any and all issues herein which can be tried by right of a jury.

Dated this 7th day of December 2011.

Respectfully submitted by:  R. David Weisskopf, pro se
2364 Jackson St.
#202
Stoughton, WI  53585
(608) 492-1477